F I L E D
Clerk
District Court

MAR 15 2021

for the Northern Mariana Islands
By_____
(Deputy Clerk)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| PING SHUN CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC <br><br> Defendant. | Case No.: 1-20-cv-00012 <br><br> **DECISION AND ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT** |

### I.    INTRODUCTION

Before the Court is Plaintiff Ping Shun Corporation's ("Ping Shun") motion for partial summary judgment ("Motion," ECF No. 18) on its account-stated claim against Defendant Imperial Pacific International (CNMI), LLC ("IPI") for food and spa services rendered. The matter was fully briefed and came on for a hearing on January 21, 2021, at which time the Court partially granted Ping Shun's motion on the undisputed amount for food services and spa services rendered, but took the matter under advisement as to the remaining disputed amount of $179,416.25 for food services. (Minutes, ECF No. 27.) The Court also granted Ping Shun partial summary judgment on its second cause of action for breach of contract of the spa services agreement, as the amount sought in the breach of contract claim equaled that sought for spa services rendered in the account-stated claim. (*Id.*) Having considered the briefs, the applicable law, and the arguments of counsel, the Court now GRANTS Ping Shun's motion on the remaining $179,416.25, therefore granting Ping Shun partial summary judgment on its entire account-stated claim for the following reasons.

## II.    BACKGROUND

### A. Factual Background

The undisputed facts are as follows.[1] On December 16, 2016, Plaintiff Ping Shun and/or its agents or assignors entered into a written contract with Defendant IPI for the provision of food services, whereby Shao Shun Xing Noodle House would provide IPI personnel dine-in or delivered meals at a fixed, low rate of $3.75 through the use of coupons, with IPI to remit payment within 14 days of receipt of an invoice with attached coupons. A second food services agreement was signed about two years later on July 25, 2018 between IPI and Ping Shun for Ping Shun to provide through Shao Shun Xing Noodle House and the 520 Restaurant three meals a day to IPI at the same rate of $3.75, with IPI to remit payment within 30 days after receipt of monthly invoices.

The billing practice was for Shun Lin Zeng ("Zeng"), agent and special manager of Ping Shun and its agents and assignors, to personally hand-deliver to IPI each month an account statement of the food services provided by both restaurants for the prior calendar month along with supporting documents. The account statement would include the total amount due for that preceding month and would include the breakdown of how the total was reached such as the number of meals provided. The invoices and documents would be given either to IPI's How-Yo Chi ("Chi"), Ms. "Vivian" Yuan Xu

---

[1] The following facts are taken from Ping Shun's motion, which are facts that IPI does not dispute in its opposition to the motion for summary judgment or even at the hearing on the motion. Ping Shun's facts are supported by Shun Lin Zeng's Declaration ("Zeng Decl.," ECF No. 18-1) and attached exhibits, including: the first Food Services Agreement dated December 16, 2016 (Ex. A, ECF No. 18-2); second Food Services Agreement dated July 25, 2018 (Ex. B, ECF No. 18-3); translated WeChat cellphone records between Zeng and IPI's VP of Hospitality Lucy Guo (Ex. C, ECF No. 18-4); an accounts payable print out given to Zeng at the March 11, 2020 meeting with IPI's Senior Manager of Property Management How-Yo Chi (Ex. D, ECF No. 18-5); translated WeChat messages between Zeng and Chi (Ex. E, ECF No. 18-6); a print-out of IPI's payment history given to Zeng at his March 14, 2020 meeting with Chi (Ex. F, ECF No. 18-7); an account payable summary email sent from IPI's Frances Mafnas to Zeng (Ex. G, ECF No. 18-8); a translated call record between Zeng and Chi (Ex. H, ECF No. 18-9); and an account summary regarding spa services payments given to Zeng (Ex. I, ECF No. 18-10).

(Assistant Director of Human Resources), or Mr. Jian Hua Min.  Zeng would then wait in person while IPI's representative reviewed the account statement, and once IPI indicated that it was satisfied, Zeng would leave the premises.

Sometime in May 2018, IPI started falling behind on its payments and only made sporadic partial payments between September 2018 and February 2020.  Zeng would contact IPI representatives—Chi; Ed Chen, Chief Financial Officer; Frances Mafnas; and Lucy Guo, Vice President of Hospitality—demanding payments, which became daily calls starting in December 2019, and IPI would promise to pay but kept asking for patience.  Zeng then met with Ed Chen on December 17, 2019 to discuss unpaid bills, of which Chen promised to pay soon.  Ping Shun continued to provide food to IPI until about December 31, 2019.

As to the spa services, IPI failed to pay Ping Shun for five invoices between February 2019 and February 2020, totaling $638.00. Because IPI already conceded that it owed Ping Shun this amount in spa services, this Court need not recite facts regarding the spa services in detail.

Months later, on March 10, 2020, Zeng received a call from Guo to meet with the Chairperson of IPI's Board of Directors, Ms. Lijie Cui, to discuss money owed.[2]  Zeng met with Cui, Guo, and Chi that day.

This is where the parties start to dispute some of the facts.[3] According to Ping Shun, Zeng brought supporting documents for the food services billed on the day of the meeting, and at the conclusion of that meeting, Cui asked for a payment plan and small discount on the balance IPI owed

---

[2] IPI's owner got personally involved after the Commonwealth Casino Commission ordered IPI to address IPI's unpaid vendors with valid claims. ("Chi Decl." at 2-3; ECF No. 20-1.)

[3] IPI's opposition is supported by the declaration of IPI's senior manager-property management, How-Yo Chi.  ("Chi Decl.," ECF No. 20-1.)

and proposed paying $460,000 in two installments, but Zeng rejected that proposal. (Motion at 5; Zeng Decl. ¶ 15.) According to IPI, Chi informed Zeng multiple times during that meeting that IPI was challenging the validity of some of the outstanding invoices since there was insufficient supporting documentation proving that the services had actually been provided for IPI, as an IPI staff would have signed off on the delivery of the meals pursuant to the second food services agreement. (Opp'n at 4; Chi Decl. ¶ 6, ECF No. 20-1). According to Chi, all Zeng brought was a ledger with handwritten records of the numbers of meals claimed, and while Chi proceeded to record the numbers from Zeng's ledgers into IPI's computer, he reinforced to Zeng that the invoices would need to have evidence of signatures before IPI would agree to pay.  (*Id*.)

It is undisputed that on March 11, 2020, Zeng met with Chi to go over the unpaid balances. According to Zeng, during the meeting, Mafnas presented a print-out of an updated accounts payable, of which Chi handwrote "2625" on the bottom of the first page to indicate a check inadvertently not included, and handwrote "Total Owe" and "263846.25". (Motion at 5; Zeng Decl. ¶ 16; Ex. D, ECF No. 18-5).  This amount of $263,846.25 is the amount that IPI does not dispute. However, the second page of the account summary also included typed information indicating an unpaid amount of $179,416.25[4] (Motion at 5; Ex. D), the amount of which IPI does dispute. According to Chi, Zeng did not bring proof of signatures by IPI employees that satisfied IPI as to the validity of all of the claimed invoices, and therefore Chi informed Zeng that IPI was not agreeing to pay the entirety of the claimed amount. (Opp'n at 4-5; Chi Decl. ¶ 7.)

---

[4] Adding these two unpaid amounts of $263,846.25 plus $179,416.25 amounts to the $443,262.50 that Ping Shun is claiming for food services. This amount also corresponds to the total based on Ping Shun's own internal records.  (Zeng Decl. ¶ 22; App'x 1 to Motion.)

On March 13, 2020, Chi contacted Zeng via WeChat and offered $450,000 payable in weekly installments as full satisfaction of all claims, including for the spa services and rental lease agreement amount, but soon after retracted that offer over concerns about the accuracy of some of the invoices. In a meeting the next day, Chi gave Zeng a print out of IPI's account record of its payment history, which showed that IPI owed Pings Shun $443,262.50 in food services.  Two days later, Zeng requested an updated copy of IPI's accounts payable records, of which Mafnas responded with an attachment table stating a balance total of $443,262.50 for the food services.  Then on March 31, Zeng met with another IPI senior account, Fu-Chang Huang who offered $400,000 as an amount but Zeng declined.

On May 11, 2020, Zeng had a phone call with Chi, during which Chi admitted to IPI delaying payment.   However, according to Chi, he conducted an audit after this call where he discovered that only about $260,000 had proper signatures that would be accepted for payment by IPI, but that the difference in amount that Ping Shun claims entitlement to could not be confirmed for the benefit of IPI. (Opp'n at 5; Chi Decl. ¶ 11.)

**B.  Procedural History**

On June 11, 2020, Ping Shun filed this lawsuit against IPI, and later amended its Complaint to assert four causes of actions against IPI for: (1) breach of contract of the Food Services Agreements, (2) breach of contract on the Spa Services Agreement, (3) alternatively, unjust enrichment, and (4) account stated.   (First Amended Complaint "FAC", ECF No. 16.)  Ping Shun then moved for summary judgment on its fourth cause of action (account stated) supporting its motion with the declaration of Shun Ling Zeng (Zeng. Decl., ECF No. 18-1) and exhibits (Ex. A through I, ECF Nos. 18-2 to 18-10; *see also*, fn.1, *supra*).  IPI filed an opposition, supported by the declaration of How-Yo-Chi, conceding to Ping Shun's statement of the legal standard and elements of the claim, and conceding to the first

element that it was presented with statements of accounts. ("Opp'n" at 2-3, ECF No. 20; Chi Decl., ECF No. 20-1).  IPI also conceded to manifesting assent to an amount of approximately $260,000 in invoices for food services that were properly documented and supported, but disputes that it manifested assent to the remaining amounts. (*Id*. at 5.)  Ping Shun timely filed its reply. (Reply, ECF No. 21).

### III.    LEGAL STANDARD

A court must grant summary judgment on a claim or defense—or part of each claim or defense—if there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marin Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 109, 1103 (9th Cir. 2000).

When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).   An issue is "genuine" if a reasonable jury could

return a verdict in favor of the non-moving party on the evidence presented; a mere "scintilla of evidence" is not sufficient. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court views the evidence in the light most favorable to the non-moving party and draws "all justifiable inferences" in that party's favor. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Angel v. Seattle–First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)).

In a diversity action raising state law claims, the substantive law of the forum state applies. *See Medical Lab. Mgmt. Consultants v. ABC*, 306 F.3d 806, 812 (9th Cir. 2002). "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). "When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 885 n. 7 (9th Cir. 2000) (quoting *Aetna Cas. & Sur. Co. v. Sheft*, 989 F.2d 1105, 1108 (9th Cir. 1993)). In the absence of controlling precedent from the state's highest court, a court may "look to other state-court decisions, well-reasoned decisions from other jurisdictions, and any other available authority to determine the applicable state law." *Burns v. Int'l Ins. Co.*, 929 F.2d 1422, 1424 (9th Cir. 1991). "When there is no dispositive Commonwealth authority on an issue, we may look to persuasive authority from other jurisdictions." *Commonwealth*

*v. Lot No. 353 New G*, 2012 MP 6 ¶ 16 (N. Mar. I. 2012). Rules of the common law, including the Restatements, "shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary." 7 CMC § 3401.

## IV.   ANALYSIS

Ping Shun moves for partial summary judgment on its account-stated claim. While no CNMI Supreme Court case addresses an account-stated cause of action, an account-stated cause of action was recognized by the Superior Court in *Bisnes-Mami (CNMI) Inc. v. Castro*, Civ. No. 04-0569 (N. Mar. I. Super. Ct. Feb. 5, 2009). In *Bisnes-Mami*, the court noted that an account is stated "when there is an agreement or recognition by the parties of the balance due on the account with an express or implied promise by the obligor to pay the balance." *Id.* (citing 1 AM.JUR.2D § 26). "'When an account has been stated, the balance, and not the constituent items, constitutes the cause of action thereon.'" *Id.* (citing 51 A.L.R.2d 331). Such cause of action accrues "at the time of the statement or at the time agreed upon for when payment is due." *Id.*

The Commonwealth's prior Trust Territory law also previously recognized an account-stated cause of action where there was "clear evidence of agreement between the parties as to balances due for certain parts of their accounts with each other." *See, e.g. Marianas Elect. & Supply Co., Inc. v. Guerrero*, 3 TTR 244, 246 (N. Mar. I. Trial Ct. 1967). "While an account may be opened and rectified on grounds of fraud, omission, or mistake, the party seeking to open it has the burden of proving the fraud, omission, or mistake by clear and convincing evidence." *Id.* at 246-47.

Given the lack of controlling, dispositive Commonwealth authority on this issue, this Court will look to the Reinstatement. *See* 7 CMC § 3401. The Restatement defines an account stated as "a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an amount

due the creditor." *Restatement (Second) of Contracts* § 282(1). It requires (1) a presentation of a statement of account, either by the creditor or debtor, and (2) manifestation of assent.  *Id.*; *see also* cmt. b.  As to the second element, "[a] party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent." *Id.*   It does not discharge any duty "but is an admission by each party of the facts asserted and a promise by the debtor to pay according to its terms." *Id.* § 282(2).

### 1.  *Presentation of a statement of account*

As to the first element, Ping Shun argues that it presented IPI with monthly statements of accounts for payment by hand-delivering statements with supporting documents to IPI's offices. (Motion at 11-15; Zeng Decl. ¶ 7). Ping Shun's agent, Zeng, would wait until an IPI representative reviewed the statement and supporting documents to answer any questions, and would not leave until IPI was satisfied. (Zeng Decl. ¶ 8.) In opposing summary judgment, IPI concedes this element. (Opp'n at 3.)  Given that this undisputed fact is also supported by the record, the Court finds that there was a presentation of statements of accounts. Thus, the question turns to whether there was a manifestation of assent by IPI such that Ping Shun is entitled to summary judgment.

### 2.  *Manifestation of assent*

At the hearing on the motion, IPI conceded that it owed Ping Shun $263,846.25 for food services and $638.00 for spa services rendered based on the invoices.  The remaining issue then is whether IPI manifested assent to the remaining $179,416.25 in food services.

For a manifestation of assent, the assent need not be explicit, as the "recipient's assent may be inferred from his conduct." *Restatement (Second) of Contracts* § 282(1), cmt. b.; *see Bisnes-Mami (CNMI) Inc. v. Castro*, Civ. No. 04-0569 (noting express or implied assent). "[H]is retention of the

statement for an unreasonably long time is a manifestation of his assent. How long a time is unreasonable is a question of fact to be answered in the light of all the circumstances.  The parties . . . may fix by agreement a time after which the recipient will be considered to have assented to the statement of account." *Restatement (Second) of Contracts* § 282(1), cmt. b.

Ping Shun argues that IPI manifested both express and implied assent to the statements of account. (Motion at 15.) Specifically, Ping Shun argues that IPI expressly consented by (1) expressly confirming its acceptance of the accounts in person before Ping Shun's agent left IPI's offices, (2) repeatedly promising IPI that it would pay Plaintiff the outstanding balances due, including on December 17, 2019 when the parties met in person, and (3) repeatedly seeking a discounted rate either in $460,000, $450,000, or $400,000, and (4) providing its accounting record during the meetings that included invoice amounts and unpaid amounts, amounts which were ultimately affirmed by email when Zeng sought an updated account form. (Motion at 15-19.)  Alternatively, Ping Shun argues that IPI implicitly assented by (1) failing to object within a reasonable time, (2) continuing to accept Plaintiff's performance, and (3) continuing to make partial payments. (Motion at 19-25.)

While IPI concedes that about $260,000 of the outstanding invoices were properly documented and supported by signature, it disputes that it manifested assent to the remaining $179,416.25 for food services rendered between August 2018 and October 2018 (*see* Ex. D), as Chi repeatedly communicated to Ping Shun's representative in their March 2020 meeting that IPI was not agreeing to the final computation of the amount owed. (Opp'n at 5.) Moreover, IPI notes that manifestations of assent to a compromise are not the same as manifestations to a computed amount, as required for an account-stated claim. (*Id*. at 4.)

The problem here is that IPI is raising issues to the amounts in March 2020, nearly two years after it started falling behind on payments and three months after food was last provided.  Pursuant to the food services agreement, IPI was supposed to pay Ping Shun within 14 days after receiving the invoice according to its first food services agreement, and within 30 days after receiving the invoice pursuant to the second food services agreement (Ex. A and B). If IPI had any objections to the monthly invoices, it should have objected to them within those reasonable time frames that the parties agreed to.  Instead of objecting to any amount, IPI accepted the monthly statements as correct each time Zeng delivered the statements with supporting documents.  IPI's continued partial payments in 2018, 2019, and even 2020 are evidence of IPI's confirmation of the statements being correct. IPI's reliance on *Associated Petroleum Products, Inc. v. Northwest Cascade, Inc.*, 203 P.3d 1077, 1081 (Wash. App. 2009) for the proposition that existence of a payment, in and of itself, is insufficient to prove assent is misplaced.  In *Associated Petroleum,* the court found the defendant's defense that plaintiff failed to give prior notice of the additional fees assessed and that were outside their agreement, such that there was potential fraud, created a genuine dispute of material fact to overcome the motion for summary judgment, even after defendant made payments. *Id*. at 1082. Here, there is no genuine dispute that Ping Shun submitted to IPI the statements with supporting documents every month for the prior month's food services rendered. IPI also raised no issues regarding hidden fees tacked onto the invoices.  Instead, IPI reviewed the statements and was satisfied, and when Ping Shun made repeated demands for payment for the outstanding balance, IPI continually promised to pay.  IPI's objections to the balance of the statement that was previously tendered with supporting documents by Zeng and accepted by IPI over a year later are unreasonable.  *See Restatement (Second) of Contracts* § 282(1), cmt. b. (noting that retention of statements for an unreasonably long time is a manifestation of assent);

*Delta Consulting Grp, Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1139 (7th Cir. 2009) (noting that Defendants did not respond or object until one year later, which was an unreasonably long time); *Mulford v. Caesar*, 53 Mo.App. 263, 269 (Mo. Ct. App. 1893) (noting that "[t]he defendant's silence for a period of two weeks after receiving the account; his several payments on account thereafter; his statement under date of October 22, 'I will pay you some money every month, as much as I can spare, until paid;' his equivocal statement that he owed the balance as a gambling debt, all tend to show an account stated."). IPI thus manifested implicit assent to the amount due by failing to object to the invoices in a reasonable amount of time. Any factual disputes over whether IPI may have assented to the account balance beginning with the March 2020 meetings are not genuine disputes of material fact barring summary judgment.

Furthermore, it does not logically follow for IPI to have repeatedly offered amounts over $400,000 as a compromise if it only believed that about $260,000 of the invoices were accurate. *See* Reply at 8; *Delta Consulting Grp.*, 554 F.3d at 1138-39 (noting that the Defendants' partial payments, active conduct in asking Defendant from seeking payment until it resolved its main underlying litigation issue regarding a construction project, and continuing use of Plaintiff's services despite expressing frustrations indicated implied assent.)

Moreover, evidence supports that IPI did express manifest assent to the amount owed, even as late as March 2020. Mafnas undisputedly sent to Zeng an attachment showing the total account balance due of $464,583.64[5] (Ex. G), which evidences an express manifestation of assent to the total

---

[5] This total amount includes $20,683.14 for a rental contract not subject to this action. (Motion at 6.)

amount due. The fact that IPI also made partial payments and recorded those payments evidences an acknowledgement that it owed amounts for those services. (*See* Ex. D and F.)  Finally, IPI failed to provide any evidence demonstrating fraud, omission, or mistake that would otherwise contest the account stated. *See Marianas Elect. & Supply Co., Inc.*, 3 TTR at 246.   Accordingly, summary judgment is proper in favor of Ping Shun for the entire amount of $443,900.50.

### V.       BREACH OF CONTRACT ON SPA SERVICES AGREEMENT

The Court also granted summary judgment on Ping Shun's second cause of action for breach of contract on the spa services agreement in the amount of $638. (Minutes.)  However, the Court clarifies that this amount is not in addition to the $638 granted in the account-stated claim. Rather, Plaintiff can only recover once for this amount under either theory because the claims arise from the same facts. *See* 2 AM.JUR.2D § 32 ("A plaintiff may not receive a double recovery for the same injuries or losses arising from the same conduct or wrong. Thus, a double or duplicative recovery for a single injury is invalid. The double-recovery rule is derived primarily from principles of unjust enrichment.").

### VI.      CONCLUSION

Ping Shun has provided IPI's employees over 100,000 meals at the low cost of $3.75 per meal that have been left unpaid and of which IPI has manifested assent to pay.  Yet over a year later, IPI disputes ever manifesting assent to paying for the food services.  For the foregoing reasons, the Court GRANTS Plaintiff Ping Shun summary judgment on its account-stated claim in the amount of $443,900.50 and its breach of contract claim for the spa services agreement, for the total amount of $443,900.50.

IT IS SO ORDERED this 15th day of March, 2021.

RAMONA V. MANGLONA
Chief Judge